7-2516, Del Federal System versus United States. Mr. Ashman, please proceed. May it please the Court, Your Honor, the Army concluded that the initial award decisions in its procurement did not comply with the regulation calling for discussions with offerors, so the Army acted to comply with the regulation by conducting discussions. Corrective action was therefore rationally related to the procurement defect. The trial court applied an incorrect standard of review to the agency's corrective action that allowed the court to substitute its judgment for that of the agency. Indeed, the trial court told the agency what to do in this case. Okay, I have to break it up because it just sounds too canned. You're just reading from a script, and that'll put me to sleep, and you don't want to do that as the appellant. So basically, your argument is narrowly targeted test doesn't jive with arbitrary and capricious standard of review. That is correct, Your Honor. We believe that it's inconsistent with the great deference that the agency— And we've never decided this, even though there are a number of court federal claims cases that seem— I think there's a couple that seem to embrace this narrowly targeted, but they all seem to be written by the same judge, and then there are other judges that maybe criticize that test or don't necessarily embrace it. Is that a fair characterization of the precedent? We believe that is fair, Your Honor. The trial court is certainly not in unison on what the correct standard is. The trial court in our case has embraced the narrowly targeted standard. It's been criticized outright by Judge Kaplan in the professional services case, and other court of claims judges have recognized the tension and found ways around it. And this is a question of law for us, isn't it? You know, what the appropriate test would be under the arbitrary and capricious standard? Yes, Your Honor. The proper standard to review would be a question of law. Have we provided express guidance outlining the outer limits of what constitutes a rational basis? Your Honor, the cases from this court that addressed corrective action typically came up in the context of reviewing a GAO decision, and examples are the Raytheon decision and Honeywell, in which the court just asked, was the GAO recommendation or the GAO's findings, was it irrational or rational? And we believe that that's, while the court of federal claims has distilled the standard down to a reasonable under the circumstances, but we believe that's on par or consistent with what this court has said, that it has to be rational. And the problem that we have with the language, and we're not asking the court to, you know, to nitpick language that the trial court used, we believe this is very important, because in order for there to be usable standards of review, there has to be fidelity to the language, because to use a sports analogy, the standards of review, as in soccer, it sets the width of the goalpost. The appellees argue in the alternative, that even under the legal standard U.S. spouse, the Army's corrective action is still rationally related to the procurement defects. Do you agree we can reach this question if we disagree with the lower court's created standard? Yes, this court may reach the ultimate decisions on rationality, because in a bid protest case, the court reapplies the administrative records, the review of the administrative records standard in 52.1 to the record. Am I correct that there are still some factual issues still in dispute, assuming that we agree with you about the standard? For example, the parties dispute how best to define the procurement defects, major and material mistakes versus clerical errors. We don't believe that there is a dispute. Let me back up. We disagree. So in the Army's corrective action memo, the Army attorney was evaluating the protests, evaluating the record, and made statements to the effect that these are all easy fixes, that the mistakes can be fixed very easily. Now, the trial court, and I believe what the appellees are arguing, is that this was an acknowledgment that the clarifications as legally defined, that the Army was acknowledging that, that that was sufficient. And we disagree with the trial court's characterization of what the Army was saying. This was a lowest price, technically acceptable procurement, in which the offerors just had to submit their suite of computer products, and either they checked the box as complying or not. So what the Army counsel was saying, that it's easy to go back to the offerors, identify what was wrong with their proposals, and let them correct it, because they just had to resubmit this Excel spreadsheet. But the legal point in which we disagree with the trial court is to do that, they have to change, in certain instances, they have to change the types of computer equipment that they offer. And this goes to a, they're making a revision of their proposal. And in that instance, that falls out of the realm of clarifications, which are limited exchanges, and it goes to the heart of the proposal crafting process, and discussions on that, and that's where discussions are appropriate. And didn't the Army, I'm sorry. No, no, go ahead. Didn't the Army in this case also limit the corrective action to the proposals that you were only allowed to remedy the sections where the defects were present as a result of the confusion? They didn't allow them to make whole new proposals, correct? Yes, Your Honor, that's the intent, Your Honor. So there is a dispute. So in the record, the Army's corrective action memo at page 7021 of the record, and then we provided an example of the evaluation notice at 7097. The Army, the intent was that offerors would only revise their proposal to the extent it corrected a deficiency. However, we acknowledge, and the appellees have pointed this out, that there is language that seemed to crack the door for wholesale proposal revisions, whether or not they're connected to a deficiency. And so what we point out in our reply brief, and there's a passage of the oral argument that I pointed out to the trial court, that that's a very easy fix for the Army to make clear in the letter. Only where the deficiencies were. Yes, Your Honor. Not wholesale revision. Yes, Your Honor, that was an easy fix. The appellees have an argument which has some appeal about the revealing of their prices. Why did the Army disclose all the pricing, and is it commonplace to disclose in a lowest price technically acceptable procurement? So, Your Honor, yes, it is common because it's actually required by law. So in any procurement, regulation 15.506D2 requires, after the agency has made its award decision, the regulation requires the agency to release the awardee's prices. And the Army did that here. They did it pursuant to a regulation. And then the defects were discovered after the prices were released. So what the Army did in an attempt for fairness is, when they decided to take corrective action, they released anonymously all prices. When you say anonymously, were the individual company names removed from the various proposals? Your Honor, so the initial awardee's prices, their prices were identified to the awardee. That happens all the time. In every contract, when it's awarded, everybody knows who got it and exactly what the amounts were. That's correct, Your Honor. That becomes public record. I'm saying, following up on Judge Wallach's question, it seems that the Army then went ahead and decided in fairness, since people now have a target to shoot at, namely they now know what the awardee listed for everything, so they know how to come in under it. It seemed only fair, I guess, to list everyone else's as well? Yes, Your Honor. Why? Why is that only fair? Who is it fair to? What does it matter? Well, in this case, Your Honor, the initial awardees, they were not the lowest priced afterwards. So if the offerors, who were not initially technically acceptable, they get a chance to revise their proposals, the initial awardees may likely be pushed out of the competition. I understand. And you used the word anonymous a minute ago, and so I was trying to figure out what you meant by anonymous. When they did release all of the numbers that each person gave in the proposal, did they strip the name of the proposer?  That's right, Your Honor. We appointed the names that are indicated. That's correct, Your Honor. So it was the second release of prices was anonymous, Your Honor. They just released the prices of all the offerors, but it was anonymous. Was it the ultimate? Is it just the ultimate offer, or did they have the breakdown of the proposals? It was the ultimate offer, the total proposed price, Your Honor. As Judge Schall pointed out, that's at 7379 and 7380. How does that really hurt the people who propagated those offers? I mean, I can see it in Judge Schall's. It's like two pages, almost a page and two-thirds long. It's just a bunch of numbers. I don't understand the prejudice that's being alleged as a result of that disclosure. We understand the argument to be that the initial awardees, now that their prices have been released, as Your Honor pointed out, in the revised process, that those that didn't win, that they know what the target is, as you said, Your Honor. And we understand that that would make the initial awardee unhappy, but the balance that has to be struck here is, and we believe this as we point this out in our brief, that it is more important to have a procurement that's conducted  because the initial awardee, the initial award was not conducted. It was not properly done, Your Honor. Mr. Drescher, let me ask you a question. The complaint here is that there are, quote, discussions being held that shouldn't be held at this point, correct? Yes, sir. The Court of Federal Claims said the time to hold discussions, as that term is used, was after the offers were received but before award, and now it's improper to hold discussions. Yes, Your Honor. That's where we are. What exactly can you point to in the record as an example of a, quote, discussion about which the Court of Federal Claims was concerned and about which the appellees are concerned? Can you point me in the record to something that says, okay, here's a discussion and this is the kind of thing they're bothered by? Yes, Your Honor. We provided in the record an example of discussion letters. So the agency went ahead and took the step of beginning discussions and sent letters before this protest happened. So these are the letters that started 7047? Yes, Your Honor. I'll point out the specific one that I had. Yeah, I mean, show me something, if you could, please, that I can be confident is a, quote, discussion, close quote, that is the focus of the concern here. And I'll ask the same thing for Ms. Stetson. So, Your Honor, in the record at page 6422 is an example of a discussion letter, and this was issued to one of the offerors who was ---- 6422? Yes, Your Honor. And if you'll see on that page ---- Let me get to it. My pages have bent over here. Okay. Okay. Actually, Your Honor, that was ---- I'm going to have to correct that and send you to a different one. That was the letter informing the offeror that they were not ---- See, I thought that we had ---- I thought that the discussions, as that term is used, were reflected in these various letters that are in the 700s. For example, at 7076. Yes, Your Honor, and that's what I ---- I apologize. I meant to direct you there. That is a discussion letter. The agency is pointing out the deficiencies and allowing the offeror that you need to correct these. And this is the discussion about which the Court of Federal Claims was concerned? That's correct, Your Honor. That's correct. Okay. So you are way over your time. Do you have anything further? No, I'm fine. What number did he start with? What did you give him on the clock originally? Eleven minutes. So you've used your time, your rebuttal time, and two minutes of his time. So, Mr. Baker, I'll give you two minutes, and then I'll extend Ms. Stetson's time accordingly, and I'll give you one or two minutes for rebuttal. But, Mr. Baker, you better have something new and different to argue if you're going to take up our time, given that he's already used everybody's time up. So make it worthwhile or don't stand there long. I'm going to just address one point. Your Honors asked and Mr. Ashman noted that the government's intent or stated intent when it opened discussions initially was to limit discussions in a way that would allow offerors to only address certain deficiencies. And this was identified in the government's reply brief. I want to note this is an area where I would dispute that even that is the proper remedy here. By limiting offerors to only revising proposals to address prices, to fix deficiencies in the technical proposal and to fix prices for only those deficiencies, I think is inherently unfair. And why? Because if you do that, I think it prejudices those offerors, like HPI Federal, that had only a handful of errors in the technical proposal, and it would prejudice the awardees that had no errors in their technical proposals. Why do you think that is unfair? You gave the numbers in the sections with no errors because that's what you thought was your appropriate bid. Now, with the hindsight of knowing what numbers the awardees had in that column, it would be a little useful to you if you were allowed to mix up all your numbers and change them. Well, so what's going to happen, Your Honor, in the approach that the government has now outlined, is that those offerors that had widespread errors in their proposal are now going to have a greater ability to revise those prices. But you see that those that had widespread errors, as though it was their fault. Just like it's not your fault, it's not their fault. The reason they had those errors, it has been determined, and doesn't really seem to be totally in dispute, is because the government's solicitation was confusing and caused them to submit erroneous proposals. So it is apparently through no fault of their own, according to the decision. Well, I'm not sure that's actually quite accurate. And I think that the lower court even identified that there were some proposals that had errors that were not resulting from the ambiguities. My concern here— Wait, but is the government proposing to allow people to correct errors that have nothing to do with the ambiguities as well? Correct. Because once discussions are opened, those discussions have to be meaningful. And that is—and the way meaningful discussions is defined is to allow offerors to correct all significant weaknesses and deficiencies in their proposals. And my concern here with the approach of the government— Well, once those discussions are opened, can't your client, if it realizes that it put a number down in the course of those discussions, makes it think that the scope of the work is greater or less than what it had fought based on the proposal? But if the discussions inform your client, wouldn't they then have the right to argue that they ought to be able to change that number as well, because the discussions informed their thinking? They could change—so just as a practical example, they could change those prices for those handful of errors, the small number of errors that they had in their proposal. Whereas other companies, now with the benefit of knowing all of the prices that offerors have submitted, will have a greater ability to affect their price. Thereby—so, for example, my client might be able to lower prices in a handful of areas, decrease their price by a small amount. Another client may have had 30 or more errors. In fact, there are some cases where they have over 20 errors, would have a greater ability to reduce that price. Okay, but what are the chances those people end up with the contract? Let's be honest. The people who came in with 20 errors originally, and as the government explained, they didn't even take the lowest price in this case because other factors matter, right? In this particular case, Your Honor, where you're dealing with commercial off-the-shelf items, once offerors are informed as to what the deficiency was, it's an easy fix. If that's true, then why didn't the government go with the lowest price contract? I'm sorry, Your Honor? If that's true, why didn't the government go with the lowest price contract? Why didn't the award go to the lowest price contract? I don't know the answer to that question, Your Honor. So obviously there are other criteria. Well, there's not. In this particular context, it had to go to the lowest price technically acceptable criteria, or offeror. And in this particular—there was one offeror that was not being technically acceptable, and so they didn't get the award. Okay. Thank you, Mr. Baker. You made it worthwhile, Mr. Baker. Ms. Stetson. Good morning, Your Honor. We'll give you 15 minutes. If you need more than that, you can have it. Understood. Yes, thank you. Let me start with the standard that we all agree on because while I think it's possible to defend narrow targeting, it's not necessary for the reason, Judge Wallach, that you mentioned. I think it is possible on this record for the usual standard to apply and for the Army's corrective action, which was not a limited corrective action, as the Army recommended, was wholesale corrective action, was overly broad. So can we start with saying that you've abandoned narrow targeting? I think I would say rather than abandon it, that it's not necessary to have a referendum on narrow targeting in this case because if you look at the standard that we all agree on— Well, the Court ruled that way, and we're going to have to deal with it. So you're not arguing in favor of the trial court's position? I don't need to argue in favor of the trial court's position because there is a standard on which I and my opposing counsel agree. Okay, well, let's suppose we don't agree with you. Right. That you can win on this other standard. So then we have to reach the narrow targeting. So what's your position on that? My position is that the narrow targeting standard actually is designed, as even Judge Jacobs recognized in the information systems case, it's designed to be calibrated to the defects, and that's exactly what the standard on which we all agree says. The standard on which we all agree says that the corrective action must be reasonable under the circumstances and appropriate to remedy the impropriety. That's the professional services case. So if some point— Narrowly targeted only comes from some disputed Court of Federal Claims cases, right? That's not our language. It's true, but I would say this, Judge Wallach, that it comes from some Court of Claims cases, not because there is some rogue faction of judges. In fact, Judge Wheeler has used the other standard that I just articulated as well. It has to do with what defect is being remedied, and that's why if we're going to look at the standard and we can discuss— Can you dispute that our prescribed rational basis test is binding precedent? No, I don't dispute it. You're saying that narrow targeting is part of rational basis. I am saying that the narrow targeting language that some courts have used is language that even Judge Wheeler in this case used in the context of that broader standard that I articulated and on which Mr. Ashman agrees, which is was the corrective action reasonable under the circumstances and appropriate to remedy the impropriety? So you look at the— How do you square narrow targeting with what we've articulated, which is the arbitrary and capricious standard? Your Honor, I would square it again by reference to the cases that use that standard, use it in the context of the particular defect that is being targeted. When you have, for example, in the Sierra Nevada case, a defect that permeated the entire evaluation process, the Sierra Nevada judge decided that narrow targeting, that concept wasn't appropriate because of the breadth and penetration of the defect. But again, if you would like me to say I abandon narrow targeting so that we can get to the point on which we all agree, I will do it. My point is that narrow targeting actually is just a formulation that fits within this standard. But if we look at the standard on which we all agree— Would you agree that it's a formulation which may lead to error on the part of the trial court? I would agree that it's a formulation that may lead to error on the part of the trial court if the narrow targeting test is applied against the kind of Sierra Nevada defect that I identified. But here, I think what the trial court was confronted with were the circumstances, Judge Moore, that you identified, which is this is a post-award protest, which means that all of the prices have been disclosed. So set that circumstance to one side. So your view is clarifications would have been good enough, right? They should have just been allowed to clarify. Does that mean alter their proposals to the extent that they didn't understand that hard line and what it meant in the spreadsheet, that you're now going to let them change their numbers and resubmit their proposals? Right. What is your view of what the Army should have done? So two things. The first is it wouldn't just be us saying that clarifications would be appropriate. It would be HPI. You will see in the appendix that HPI says over and over again, we made minor clerical errors. These are easily resolved in a matter of moments through clarifications. But I can offer, I think, more than that, which is, Judge Moore, you asked Mr. Ashman the question about whether the government Do you agree that those are minor clerical errors across the board? I do agree because HPI has represented that they are. Well, what about everybody else? How do you describe those as clerical errors when they disqualified and led unacceptable scores for 19 offerers? And that leads me to the point that I was making in response to Judge Moore's observation earlier. Judge Moore, you made the point to Mr. Ashman, you asked him, I think, didn't the government limit discussions to the defects resulting from the confusion? And Mr. Ashman said that's the intent. Now, it's also true, as Mr. Ashman pointed out, that the discussion letter that came out in the 7,000s range takes a much broader approach. It doesn't say only resolve the deficiencies resulting from the errors in the ambiguous spreadsheet. It says resolve those deficiencies. If you change anything else, it's at your peril. And, by the way, give us your best prices, untethered to any of the changes that they're actually making. If this court concludes that the remedy that the Trout Court offered is too broad and concludes that discussions in a limited sense are appropriate because of Judge Wallach, the reason that you pointed out, if there are things that can't simply be resolved through clarification but need some kind of negotiation, which is what a discussion is, I think a lot of the clerical errors that the judge pointed to below are all in the nature of clarifications. But if you conclude that limited discussions are appropriate, those discussions should be limited in exactly the way that Judge Moore said, which is that they should be limited to the defects resulting from the confusion. And that gets back to the standard of reasonable under the circumstances. You heard Mr. Baker argue for something much broader. Mr. Baker argued for full-scale discussions, remedy all of the deficiencies, no matter how many, no matter how egregious. But then that gets back to the pricing problem. I'm sorry to interrupt you, but let me ask you, what exactly are the, quote, discussions, close quote, about which you complain? The discussions about which we complain would be. . . And that bother the Court of Federal Claims. Sure. So we're not yet complaining about those discussions because, of course, we're here on a different posture because only clarifications have been permitted so far. The discussions about which we would complain and have reason to complain. Well, the discussions that were proposed in the corrective action that was challenged in the Court of Federal Claims. In other words, in the corrective action, the Army said we're going to conduct discussions. Okay? Yes. And that was challenged in the Court of Federal Claims successfully. What are the discussions that the Court of Federal Claims was concerned about and that you are concerned about? They would be the discussions that are not related to the defects resulting from the confusion, just to use Judge Moore's formulation again. There were bidders in this procurement that had applications that were riddled with errors, including, I think Judge Wheeler used the word, egregious errors. There were bidders, you heard Mr. Ashman, I think, say, that had, maybe it was Mr. Baker, had 20 or more defects. Our complaint would be, if you reopen discussions to all of those bidders and you permit them to fix all of those defects, not just the defects resulting from the confusing spreadsheet, the equipment submission form, you are inviting a situation where the winning bidders have to bid again against themselves. And it is no answer, Judge Moore. Well, no, aren't we inviting a situation where the Army is going to get the best value for the government? Isn't that the situation you're actually creating? I think it's... And isn't that the goal of military procurement? At least I hope it is. That is certainly the goal. But I think an equal goal is to make sure that the procurement process maintains its integrity. And where you have a disclosure of prices, which by the way... And this procurement has had problems. I mean, even you all admit there are problems, and you're amenable to clarifications. You don't like the solution they've proposed. But the corrective action they've proposed, quite frankly, is one that as a taxpayer I'm favorably inclined towards, and you would think you would want the Army to operate in this way because the corrective action that they've proposed, while I think somewhat narrowly tailored and not sort of a free-for-all on new proposals, is nonetheless going to result in the best value for the government, isn't it? I don't think that's entirely accurate for a couple of reasons. The first is this was not a value procurement. This was a lowest-price, technically acceptable procurement, which means, as I think you were told by opposing counsel, lowest price... See, what you're really bothered by is you might have to go lower now, right? Now that everybody knows what you bid, so there's a bullseye on your back, you have to go lower. And you don't want to go lower because that stinks, because you won the procurement with a certain profit margin in place and your client was happy. But now, because it's being redone, you might actually have to go lower to be able to hold on to the contract. We won the procurement submitting a technically acceptable offer that the government picked up. To a defective procurement. To a defective procurement, which is why I'm here conceding that if the government wishes to reopen limited discussions aimed at eliminating the defects resulting from the confusion, that reintroduces the fair playing field. It would not be fair for discussions, as they are currently scripted now... Well, how did you read the government's... ...to attach to every error? How did you read the government's concession as to the narrowness of its scope? I read there to be a gap. I think for the reason that Mr. Ashman pointed out. There's a difference between saying, as Judge Moore did... No, no, no, what Mr. Ashman said in oral argument. What Mr. Ashman said was actually two different things, and that's where the gap is. Okay. Mr. Ashman's response to Judge Moore was, that's the intent, to Judge Moore's question about defects resulting from the confusion. We are fine with that. But what Mr. Ashman said in his brief, and next, is broader. What he said was, to the extent that the discussions correct a deficiency... You should sit down. You've got the concession you want. I want to clarify that it's the narrower concession. The concession in the brief was not that concession, and there is a huge gap, for the reason that you heard from Mr. Baker. If I could finish, there is a huge gap between saying, defects occasioned by the ambiguities, and all of the other defects. Those should not be subjected to discussions. If this was a moot court, I would have stood up and said, we'd like to thank the government for its concession. We agree. The reason I'm not comfortable doing that, is because Mr. Baker certainly doesn't agree with the concession. I know that. And the government's concession, if indeed it was, was not something that he made in his brief. So if we are going to accept that concession, and we can all get on record as doing that, I want to put a pin in the fact that that concession is to Judge Moore's formulation. What if we wrote an opinion that said that the corrective action proposed to us, which we understand to be limited to permitting discussions related to the ambiguity in the spreadsheet, the defect that was identified as creating the fraud procurement. We understand the government's representation to be that the corrective action is opening up discussions on those points. That is not arbitrary and capricious. How do you feel about that? And then re-bidding it. And then re-bidding it, of course, re-bidding it. Right. I think I'm fine with that. I think if the discussions are limited to... Let's see what he says about that. Right. If the discussions are limited to defects resulting from that ambiguous equipment submission form, which is what the defect was identified, if it's those discussions, we don't have a problem with that. It's the broad corrective action that they initially undertook, and the slightly less... If you're bothered that people screwed up other stuff that's completely unrelated, and now they get to fix it, and that's not fair. That's not fair precisely because that's the point where the circumstances and the impropriety come in. Our prices have been disclosed. If you want to level this playing field, level it. Don't tilt it. All right. If there are no further questions. Thank you. Okay. Mr. Ashman. Thank you, Your Honor. You have two minutes. Thank you, Your Honor. I would like to... Focus on this concession idea because... Yes, Your Honor. I'll get right to it. There were two defects in this case. There was the ambiguities in the solicitation, and there was the failure to conduct discussions was an independent defect in and of itself. There was a regulation that called for discussions. Under the facts of this case, the agency didn't follow it. To correct for that defect of not conducting discussions, the agency needs to conduct discussions. To conduct discussions, the rule is they have to be meaningful. To be meaningful, the agency has to give offerors an opportunity to correct all of the deficiencies and significant weaknesses in their proposal. So even the ones that are not related to the ambiguity. That is correct, Your Honor. So you didn't, in fact, concede what I thought you did, or Judge Wallach may have thought you did, and this is why she stood up there so long, because she suspected you were going to get back up and retract from that concession. Yes, Your Honor. What we were trying to clarify is in the discussion letters, the Army walks through each offeror's deficiency and significant weakness. It tells the offeror you should only revise your proposal to correct these deficiencies and weaknesses. Are they required to have pre-award discussions for every solicitation? Is it unique to this solicitation? Generally, in FAR Part 15 procurements, it's at the agency's discretion. However, there is the DFAR's regulation applicable to this procurement because it has an estimated price of over $100 million. So in those circumstances, the DFAR said, agency, you should conduct discussions. Should doesn't mean must. It does not, Your Honor. So are you sure that there is a defect in failing to conduct pre-award discussions? Yes, Your Honor. What the analysis is is the decision, while there is still some discretion on discussions, the decision has to be a rational basis not to discuss, not to conduct discussions. And in this case, and the trial court agreed, that the record did not support the agency's decision not to conduct discussions, that they should have happened. The Army's view is that it should have conducted discussions and that when it failed to do that, it was an error. That is correct, Your Honor, that that in and of itself was a defect. These were discussions after the offers were received. The discussions would, if it was conducted correctly. They're pre-award, but I think Judge Schall's point is important, is that after received, but pre-award. Yes, it should have happened pre-award, Your Honor. See, this was a kind of an off-the-shelf procurement, and there are two types of discussions, I think. You can have certain types of solicitations. There are sort of ongoing discussions during the procurement, but here you had off-the-shelf items, and that's what kind of took you out of, I think, the requirement to have discussions automatically. Well, the way the regulation doesn't make that distinction, Your Honor, the only distinction in the regulation is the price threshold, and the price threshold was met in this case, so the expectation... What does post-submitted pre-award discussion even look like? I don't understand. Does it afford an opportunity to then correct your proposal, even though it's already been submitted? Yes, Your Honor, there would be an initial evaluation. The evaluators would note the problems with the proposal. They would send a letter to the offeror and say, these are the problems, these are the deficiencies. You have an opportunity to correct them and submit your best final offer. And so is that done sort of bidder by bidder? I assume that the discussions are open. Are they open, meaning publicly available? Do all the bidders have access to the question and answer? No, Your Honor, because generally that would be competitive proposal type of information, so one offeror would not know the other offeror's weaknesses and deficiencies. But the point is the discussions have to be meaningful and equal. To be meaningful, the offeror has to have an opportunity to correct all of their deficiencies and weakness, and in this case that means those deficiencies that even went beyond just the solicitation ambiguities. Mr. Ashen, what I was referring to was 1379. It says, in accordance with FAR 52.212-1 entitled Instructions to Offerors Commercial Items, the government intends to award without conducting discussions with offerors. And I read that as saying, okay, even though we're in this high money range, given the nature of the items to be procured, as opposed to we're not building a new jet airplane, we're not going to have discussions, because in a jet airplane there are discussions all during the procurement process. What the complaint here is that once there were problems disclosed, ambiguities, the hard line issue, there should have been discussions then, right? Yes, Your Honor. So the solicitation did state it's our intention not to conduct discussions. However, this regulation exists in the agencies. No, but I'm saying the solicitation said we're not going to conduct discussions, and my feeling was that makes sense because you have off-the-shelf items, you know, commercial items. But the problem is once you got into this situation where there were ambiguities and problems in the solicitation, then the government said we should have at that point, post-offer, pre-award, have conducted discussions. That's correct. That's the point, right? You also should not have said we will not conduct discussions. Isn't that correct? Well, it said, I believe, the language. Reserved the right to. Reserved the right, but I'm sorry, Your Honor, the intention was not to conduct discussions. There was still the discretion, and when you read the solicitation in accordance with the regulation, that discretion, there has to be a reasonable basis not to conduct discussions. Just out of curiosity, when the awardee's proposal is accepted and the award is made, do all of the details of the proposal become public or only the bottom line figure? Your Honor, not all of the details become public. The parameters of what is released in addition to price, there's a FAR regulation on that, that's 15.506D2, which says exactly what is released. I'd be happy to read the regulation, but price is one of the components. It's the high-level information about the awardee, but not the specifics. Not the line-by-line, this is how we're going to get to our number? That's correct, Your Honor. Not how the batter or how the cake is baked specifically. So why is it your view still that the FAR regulation that Judge Schall pointed you to, why is it your view that that requires the Army to conduct discussions on all issues as opposed to only conducting discussions relevant to what was deemed to be the ambiguity that caused the problems? So, Your Honor, the regulation says, the regulation at issue, the DFAR, says that it wants to... What number is it? This is 48 CFR 215.306, Your Honor. And that regulation says it sets the price threshold of $100 million, and it says contracting officers should conduct discussions, follow the procedures of FAR 15.306C and D, and those are the procedures that govern conducting discussions. And FAR 15.306D says when you conduct discussions, they have to be meaningful. We have to point out the significant weaknesses and deficiencies. So the Army's discussion has to be in accordance with that FAR regulation, and that means it's more than just the solicitation ambiguities, Your Honor. All right. Thank you. Thank you, counsel. The case is taken under submission.